**UNITED STATES of America, Plaintiff,**

v.

**Sergius RINALDI, Defendant.**

**No. 01–30110.**

United States District Court, C.D. Illinois, Springfield Division.

Feb. 27, 2003.

John E. Childress, Patrick D. Hansen, Springfield, IL, for Plaintiff.

Thomas M. Dawson, Leavenworth, KS, Michael J. Costello, Joseph S. Miller, Springfield, IL, for Defendant.

### *OPINION*

RICHARD MILLS, District Judge.

Defendant seeks to withdraw his guilty plea based, in part, on his assertion that he suffers from Adult Attention Deficit Disorder.

The Court finds nothing deficient about Defendant's guilty plea. Motion denied.

Dr. Sergius Rinaldi, D.M.D., a dentist specializing in orthodontics, practiced in Central Illinois for almost twenty-five years. On March 5, 2002, at the age of 66, Dr. Rinaldi entered a plea of guilty to the charges of mail fraud, 18 U.S.C. § 1341, and obstruction of justice, 18 U.S.C. § 1518.

Now, almost one year later, Dr. Rinaldi seeks to withdraw his plea because he claims he is not actually guilty of the charged offenses.

## BACKGROUND

The Indictment charged Defendant with submitting false claims to Medicaid and destroying records to prevent the Government from detecting the scheme. The Medicaid program was established to provide medical assistance to indigent persons. The federal government provides approximately one half of the money for Medicaid while the rest of the cost is provided by the State of Illinois. The Illinois Department of Public Aid (IDPA) administers Medicaid.

The IDPA established procedures to compensate orthodontists and other medical practitioners for services provided to Medicaid recipients. Dental providers were required to submit invoice forms to a company which administered the Medicaid program for dental services on behalf of IDPA. Prior to March 1, 1999, this entity was "Delta Dental." After March 1, 1999, this entity was "Doral Dental." These companies, or carriers, had a contract with IDPA to administer claims for dental and orthodontic services. Claims for children, who were wards of the State of Illinois or otherwise under the jurisdiction, custody or protection of the Illinois Department of Children and Family Services (DCFS), were submitted to IDPA through DCFS.

Defendant claims at the time of his guilty plea he was under the impression that the IDPA only paid for orthodontic procedures on a "fee for service" basis, meaning, IDPA only paid a practitioner when he actually performed a service.[1] Under such a system, an orthodontist who knowingly submitted an invoice for a service not actually performed would be committing fraud.

Subsequent to entering the plea, "the Defense" discovered that Defendant submitted invoices using a "bundling fee" system, meaning, Defendant billed a flat rate for applying braces and making monthly adjustments and was entitled to a monthly payment on the "remaining balance" whether a patient actually received a service each month or not. Defendant now claims IDPA issued payment to orthodontists under either a "fee for service" or "bundling fee" system. Therefore, an orthodontist who submitted an invoice for a service not actually performed may not be committing fraud. Nevertheless, Defendant claims he suffers from Adult Attention Deficit Disorder (AADD), which prevented him from forming any criminal intent.

Defendant claims these "discoveries" are significant because if he is correct, he believes he is not guilty of mail fraud or obstruction of justice. However, these are revelations that should have occurred a year ago—before Defendant took a solemn oath and testified he was guilty of the crimes charged.

## ANALYSIS

 Once a district court has accepted a defendant's guilty plea, "the defendant

---

1. When the Court refers to a payment by IDPA, it is referring to a payment made by Doral or Delta Dental to Defendant on behalf of IDPA.

does not have an unlimited right to withdraw" it. *United States v. Milquette*, 214 F.3d 859, 861 (7th Cir.2000). In fact, a defendant can only withdraw it if he can "show a fair and just reason for requesting the withdrawal." FED.R.CRIM.P. 11(d)(2)(B). This is a heavy burden and it rests entirely on the defendant. *United States v. Underwood*, 174 F.3d 850, 852 (7th Cir.1999); *United States v. Ellison*, 835 F.2d 687, 693 (7th Cir.1987). "When a defendant wishes to withdraw his plea after he states at a Rule 11 hearing that it was freely and knowingly given, he 'faces an uphill battle in persuading the judge that his purported reason for withdrawing his plea is fair and just.'" *United States v. Schilling*, 142 F.3d 388, 398 (7th Cir.1998) quoting *United States v. Trussel*, 961 F.2d 685, 689 (7th Cir.1992).

Serious allegations of legal innocence, newly discovered evidence or of a previously unknown or unavailable defense often require a plenary examination. *United States v. Gomez–Orozco*, 188 F.3d 422, 426 (7th Cir.1999); *United States v. Groll*, 992 F.2d 755, 758 (7th Cir.1993); *United States v. Silva*, 122 F.3d 412, 415 (7th Cir.1997). However, courts are reluctant to acquiesce when a defendant moves to withdraw based on facts known at the time he entered the guilty plea. *Silva*, 122 F.3d at 415.

When deciding to plead guilty, a defendant considers "imponderable questions for which there are no certain answers; judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time." *Brady v. United States*, 397 U.S. 742, 757, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). "A defendant is not entitled to withdraw his plea merely because he has misapprehended the strength of the government's case or, upon reevaluation of the situation, can conceive of an arguable defense." *Silva*, 122 F.3d at 415. Allowing a motion on that basis would "degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess." *United States v. Hyde*, 520 U.S. 670, 677, 117 S.Ct. 1630, 137 L.Ed.2d 935 (1997).

 Here, Defendant asserts that he is not guilty of mail fraud because he used a "bundling fee" procedure, which according to the Dental Policy Clarification explained on discovery page 1026, was a billing method accepted by IDPA. However, the information on which Defendant bases his argument was known at the time he entered his guilty plea.

First, there is no allegation that Defendant did not know, after practicing for over two decades, how he billed IDPA.[2] Second, Defendant admits he possessed discovery page 1026 at the time he entered

---

2. Defendant's motion only states that "the Defense has now with the assistance of a health care attorney, Amy Woodhall, determined that the billing and practice procedure for orthodontia was bundling." Ms. Woodhall hails from Cleveland, Ohio. Ms. Woodhall and Thomas Dawson, Defendant's attorney from Leavenworth, Kansas, have recently been quoted in an article published in the Physician Practice Options, a newsletter available online at mdoptions.com. The article is entitled, Are Medicare Regulations Unfair? and expresses concern over the federal government's intense effort to eliminate fraud. According to the article, the Medicare regula-

tions are so voluminous and contradictory that reasonable individuals cannot be expected to follow them. David Kettlewell, *Are Medicare Regulations Fair?*, PHYSICIAN PRACTICE OPTIONS, October 15, 2002, at 3. According to Mr. Dawson, "the Medicare regulations covering what a physician can charge for care of patients provided by the staff are confusing, and doctors' practices are being destroyed." *Id.* Ms. Woodhall stated that as a result of the confusion, "doctors are spending less time with patients. There has to be a cost-to-benefit proportionality to society as a whole before rules are issued and enforced." *Id.* at 5.

his plea. As already discussed, a defendant is not entitled to withdraw his plea merely because he has reevaluated the evidence. *See Silva*, 122 F.3d at 415. Defendant argues the Government persuaded him that discovery page 1026 did not accurately reflect IDPA's policy. Regardless, Defendant does not allege he was prevented from conducting his own investigation, prior to entering a guilty plea, to determine whether IDPA accepted "bundled" billing and whether that would be a viable defense at trial. He cannot now successfully argue that a new look at evidence, which was available at the time of his guilty plea, is a "fair and just reason" to withdraw. *Underwood*, 174 F.3d at 854 (holding that a "reevaluation of [defendant's] trial prospects afforded no basis for withdrawing his validly-entered guilty pleas").

Defendant's motion flies in the face of the testimony he provided at the change of plea hearing conducted on March 5, 2002. Defendant cannot disassociate himself from that testimony simply because he now believes he can present a defense to the crime.

■ The whole point of the Rule 11 colloquy is to establish that the plea was knowingly and voluntarily made. *See Ellison*, 835 F.2d at 693. A "presumption of verity" attaches to statements made by a defendant at a Rule 11 hearing. *United States v. Redig*, 27 F.3d 277, 280 (7th Cir.1994). "To deter abuses in the withdrawal of guilty pleas ... and to protect the integrity of the judicial process, we have held that 'rational conduct requires that voluntary responses made by a defendant under oath [when entering a guilty plea] ... be binding.'" *United States v. McFarland*, 839 F.2d 1239, 1242 (7th Cir. 1988) quoting *Ellison*, 835 F.2d at 693. "[W]hen the record indicates that the defendant was aware of the reasons supporting [his] motion to withdraw when [he] entered [his] plea ... the district court is generally justified in discrediting the proffered reasons for the motion to withdraw and holding the defendant to [his] admissions at the Rule 11 hearing." *United States v. Groll*, 992 F.2d 755, 758 (7th Cir.1993).

Assistant United States Attorney Patrick Hansen presented the factual basis for the plea.

AUSA Hansen: Were the case to go to trial, your Honor, the Government would show that during the years 1994 through 2001, Sergius Rinaldi was an orthodontist practicing from offices in Springfield and Edwardsville, Illinois. Among his clients were wards of the State of Illinois under the protection of the or custody of the Illinois Department of Children and Family Services, DCFS, as well as those receiving Medicaid assistance from the Illinois Department of Public Aid, IDPA. During this period of time, the Defendant would bill DCFS and Medicaid for services regarding these patients which included monthly adjustments to braces. Among the bills submitted to DCFS and IDPA were bills for services he did not perform including several of these monthly adjustments.

The Government's evidence would also include at least two occasions when Dr. Rinaldi billed for putting braces on children which was not done by Rinaldi.

Specifically as to Count 1 of the indictment, the evidenced [sic] would show on or about September 19, 2000, the Defendant did cause the use of the United States mail by knowingly submitting and causing to be submitted a claim to the Illinois Department of Public Aid for a monthly adjustment

alleged to have been provided to a client identified as JB or identified with the initials of JB on August 9, 2000, when, in fact, the client was not in the State of Illinois at the time. The payment for the service as well as others was made on or about September 19, 2000 by Dorel [sic] Dental on behalf of the Illinois Department of Public Aid by a check which was sent to the Defendant in Springfield, Illinois through the United States mail.

\* \* \*

The Court: Very well. Mr. Rinaldi, did you listen closely?

Mr. Rinaldi: Yes, I did.

The Court: Did you understand Mr. Hansen's words?

Mr. Rinaldi: Yes, I did.

The Court: Were you following along as the Court was also following along in paragraph 16 of the amended plea agreement?

Mr. Rinaldi: Yes, I did.

The Court: Do you dispute, disagree with any of the statements made by Mr. Hansen?

Mr. Rinaldi: No.

The Court: Very well. Did you do what Mr. Hansen said you did?

Mr. Rinaldi: Yes.

The Court: Very well. From 1994 through 2001, were you an orthodontist in the Springfield and Edwardsville area, and did you have clients that were DCFS wards and Medicaid patients?

Mr. Rinaldi: Yes, I did.

The Court: As part of your duties as an orthodontist, do you have monthly— did you bill for monthly adjustments for braces?

Mr. Rinaldi: Yes, I did.

The Court: Did you also bill for actual braces being applied?

Mr. Rinaldi: Yes, I did.

The Court: As stated by Mr. Hansen, did you bill—through these two entities, did you bill for work that you did not perform?

Mr. Rinaldi: Yes, I did.

The Court: Specifically as to Count 1, did you do the billing as specified, the billing of September 19th, 2000 monthly adjustment for work on August 9, 2000 for a patient with the initials that goes by JB, work that you did not perform?

Mr. Rinaldi: Best of my memory I did, yeah.

The Court: Very well. That claim would have been submitted through the U.S. mail?

Mr. Rinaldi: Yes.

The Court: That is the ordinary course of your business?

Mr. Rinaldi: Yes, uh-huh.

The Court: Very well. Would you have been paid by a check that would be sent through U.S. mail?

Mr. Rinaldi: Yes.

The Court: And submitted these claims you knew were false, correct, sir?

Mr. Rinaldi: Yes.

Whether Defendant submitted bills using a "fee for service" or "bundling fee" system makes no difference when the Court considers Defendant's statements at the plea colloquy. Defendant admitted he knowingly submitted false claims. This admission, made under oath, is not without consequence.

[M]any defendants seem to be under the misapprehension that a guilty plea is just provisional, and an oath to tell the truth means nothing.... Entry of a plea is not some empty ceremony, and state-

ments made to a federal judge in open court are not trifles that defendants may elect to disregard.

*United States v. Stewart,* 198 F.3d 984, 987 (7th Cir.1999)

Defendant also makes the argument that he suffers from Adult Attention Deficit Disorder. To bolster his claim, he has attached a copy of a report written by Dr. Robert E. Chapman. Dr. Chapman earned a Doctor of Medicine in 1961 and has been certified by both the American Board of Psychiatry and Neurology and the American Board of Forensic Psychiatry. Dr. Chapman has been in private practice for over thirty years and specializes in criminal aspects of forensic psychiatry. Dr. Chapman diagnosed Defendant with AADD, but opined that Defendant was competent to enter a guilty plea.

Defendant claims that because of this disorder, he has a limited capacity to organize and complete projects as well as impaired impulse control. Defendant asserts that if he proceeds to trial, he will argue that the Government cannot prove he possessed the requisite *mens rea* because AADD diminished his capacity to form criminal intent.

Defendant has not informed the Court why this defense was unknown or not available prior to the guilty plea.[3] At the change of plea hearing, the Court asked whether Defendant and his attorneys had discussed possible defenses.

> The Court: Very well. Mr. Costello, have you and Mr. Miller received a copy of the indictment?
>
> Mr. Costello: Yes, your Honor.
>
> The Court: Have you reviewed same with Mr. Rinaldi?
>
> Mr. Costello: In depth, your Honor.

> The Court: Have you also discussed with your client the discovery provided by Government, any defenses he may have, and have you also discussed the sentencing guidelines, in general, as they apply to his case?
>
> Mr. Costello: All three, your Honor.
>
> The Court: Very well. Mr. Rinaldi, will you confirm having, in fact, discussed all those aspects of your case with Mr. Costello and/or Mr. Miller?
>
> Mr. Rinaldi: Yes, I have.

The Court asks these questions because prior to entering a plea, a defendant must take stock of the situation and evaluate all potential avenues of relief. A guilty plea "is not a 'road-show tryout.'" *United States v. Underwood,* 174 F.3d 850, 854 (7th Cir.1999) quoting *Hugi v. United States,* 164 F.3d 378, 382 (7th Cir.1999). The Court cannot allow Defendant to withdraw his plea because he has concocted, after a year of plotting and planning, defenses to the crimes charged.

Defendant's Rule 11 hearing testimony contradicts Dr. Chapman's professions of impaired capacity. Defendant testified that he knowingly submitted false claims to the IDPA. As to the obstruction of justice count, Defendant admitted to removing documents that were responsive to the grand jury's subpoena in an attempt to obstruct and prevent those documents from being obtained by federal investigators. Defendant stated that he was pleading guilty to both counts because he was, in fact, guilty. AUSA Hansen presented the factual basis for the obstruction charge.

> Mr. Hansen: Additionally, as to Count 13, the Government's evidence would show that the Defendant became

---

**3.** The Court recognizes that diminished capacity is not an affirmative defense but rather an attack on one of the elements of the offense. However, for ease of language, the Court will refer to diminished capacity as a defense.

aware federal investigators were looking into his billing practices when he received a grand jury subpoena for records on or about January 23rd, 2001. Between January 23rd, 2001 and July 3rd, 2001, he removed certain records from his office that were responsive to the subpoena and did attempt to obstruct and prevent communication of these records to the investigators. On or about July 3rd, 2001, the Defendant was seen removing certain records from his office in anticipation of a search by federal agents later that day. The records were recovered and did include certain sign-in sheets and recap sheets which were, in fact, responsive to the subpoena issued.

\* \* \*

The Court: Very well. As relates to Count 13, did you receive a Grand Jury subpoena for records on or about January 23, 2001?

Mr. Rinaldi: Yes, I did.

The Court: Between the dates of 1–23–01 and 7–3–01, did you remove certain records from your office that would have been responsive to the subpoena and underlying investigation?

Mr. Rinaldi: Yes, I did.

\* \* \*

The Court: At this time, how do you plead to Count 1 as charged? Do you plead guilty or not guilty?

Mr. Rinaldi: Guilty.

The Court: How do you plead as to Count 13, guilty or not guilty?

Mr. Rinaldi: Guilty.

The Court: Are you pleading guilty because you are, in fact, guilty?

Mr. Rinaldi: Yes.

The Court: Are you pleading guilty of your own free will?

Mr. Rinaldi: Yes.

### CONCLUSION

Defendant has presented no fair and just reason that would require the Court to allow Defendant to withdraw his guilty plea. Defendant has not explained why he waited until almost a year after his plea to investigate possible defenses. Interestingly, Defendant's Motion to Withdraw was filed shortly after the Government indicated it would be seeking an upward departure at sentencing. Courts are leery of such reactionary motions to withdraw and are not inclined to facilitate obviously tactical moves by defendants. *Underwood*, 174 F.3d at 854 (stating that a defendant is not entitled to withdraw his guilty plea simply because he did not anticipate the contents of the Pre-sentence Investigation Report). Regardless of what motivated Defendant's motion, he has not met his burden.

*Ergo*, Defendant's Motion to Withdraw Plea of Guilty is DENIED. The Government's Motion to Supplement Response is ALLOWED.